# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| DESTINY WILLIAMS, | |
| *Plaintiff,* | CIVIL ACTION FILE NO. 1:25-CV-01298-SDG |
| v. | |
| JAKE FRUGE, JR. an individual, and CHAMPION E-COM, LLC, a Texas limited liability company, | JURY TRIAL DEMANDED |
| *Defendants.* | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Destiny Williams ("**Plaintiff**" or "**Ms. Williams**"), through her undersigned counsel and pursuant to Fed. R. Civ. P. 15(a)(1)(B), files this corrected Plaintiff's First Amended Complaint against Defendants Jake Fruge, Jr. ("**Mr. Fruge**") and Champion E-Com, LLC (collectively, "**Defendants**") in response to Defendants' Motion to Dismiss [Doc. 4], and shows this Court as follows:

## PARTIES

1.      Plaintiff Destiny Williams is a citizen of the State of Georgia, residing in Fulton County.

2.      Defendant Jake Fruge, Jr. is a citizen of the state of Texas.

3.      Defendant Champion E-Com, LLC, is a Texas limited liability company. This defendant was dismissed without prejudice in the state court action for lack of service prior to removal to federal court. Plaintiff intends to see that this defendant is provided with timely service of process in this federal case.

## JURISDICTION

4.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 upon removal from the Superior Court of Fulton County, Georgia, which had jurisdiction under O.C.G.A § 9-10-91 because the Defendants transacted business within this state, committed tortious acts within this state, and derived substantial revenue from services rendered in this state. The amount in controversy exceeds $75,000 and there is complete diversity between the parties.

5.      This Court has personal jurisdiction over Defendant Jake Fruge as a result of his personal contacts with Georgia in that he (not just company representatives) directly reached out and communicated with Ms. Williams in Georgia in multiple ways:

2

a.  **Webinar & Personal Solicitation**

  i. On January 11, 2023, Mr. Fruge personally hosted a sales webinar that Ms. Williams attended from her home in Fulton County, Georgia.

  ii. During this webinar, Mr. Fruge introduced himself as the "CEO" or "Founder" of Champion E-Commerce, and was the main sales person for the webinar presentation.

  iii. Fruge specifically directed his marketing and sales pitch to potential buyers across the United States, including Georgia.

b.  **Follow-Up Communications to Georgia**

  i. Fruge personally made representations about the Amazon store's profitability during that webinar, knowing Ms. Williams was located in Georgia, and that many webinar attendees were located in states throughout the country, including Georgia.

  ii. Around September 13, 2023, Mr. Fruge spoke to Ms. Williams personally, admitted that Defendants had lost her inventory and tricked her into e-signing a purported general release that was "required" in order to "release" her $3,600 payment refund.

**c.   January 2024 Phone Call to Georgia**

On January 2, 2024, Fruge personally called Plaintiff in Georgia to address her concerns and refused to issue her a refund, reinforcing that Fruge was personally involved and was aware that Ms. Williams was in Georgia.

6.     These allegations show Mr. Fruge's purposeful availment of Georgia (via webinar, direct telephone calls, etc.) and that Fruge should have reasonably anticipated being haled into a Georgia court.

### VENUE

7.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because Ms. Williams lives in this district where a substantial part of the events or omissions giving rise to the claims occurred, and where Mr. Fruge and his various companies, including Champion E-Com, LLC, transacted business and committed tortious acts.

### STATEMENT OF FACTS

8.     Ms. Williams is a 23-year old, ex-military, single mother who became one of hundreds of victims of Defendant Jake Fruge's fraudulent online marketing scheme in which Mr. Fruge sold "done-for-you" Amazon stores through multiple corporate entities with false promises of services to be provided and false promises of passive income through their purported e-

4

commerce expertise to, as Mr. Fruge described it, leverage the power of Amazon Stores.

9. Ms. Williams paid the Defendants $45,000 on February 1, 2023, and a few months later she paid $3,594.33 more "for inventory."

### A. Mr. Fruge's Initial Webinar and Inducement

10. Defendant Fruge marketed and sold his company-managed Amazon Store scheme throughout the United States, including Georgia.

11. Mr. Fruge acted as the main promoter and sales person of the program, making most of the false statements that induced Ms. Williams to pay $45,000 for his touted service.

12. On January 11, 2023, Mr. Fruge conducted a live webinar that Ms. Williams attended from her home in Fulton County, Georgia.

13. Mr. Fruge introduced himself as the "owner" and "CEO" of Champion E-Com and personally solicited Ms. Williams to pay $45,000 for a Champion-managed Amazon store, which would yield substantial monthly profits.

14. During the January 11, 2023 webinar, Fruge stated that Champion E-Com would handle "all aspects" of the Amazon store setup and management, including product research, listing, order fulfillment, and customer service, and that the store would earn substantial monthly profits.

15. In conducting the sales webinar, Mr. Fruge specifically represented to Ms. Williams and the other attendees that—other than certain decisions—her purchased Amazon store would be completely "hands-off" and

that Ms. Williams should expect it to generate monthly sales ranging from approximately $5,000 in the first month, to $20,000 by month three, to about $50,000 in monthly sales by month six.

16. In reality, Ms. Williams's Amazon store never generated a single dollar in sales from the services Mr. Fruge sold.

17. Likewise, almost none of the services sold by Mr. Fruge were ever delivered, much less in the time frame promised.

18. At the time of the webinar, Mr. Fruge knew or should have known that the services he described were very unlikely to be performed.

19. At that time, Mr. Fruge knew or should have known that the level of sales he touted was equally unlikely to be achieved.

20. The webinar was intended to and did result in customers signing up in the state of Georgia, including Ms. Williams.

21. On January 31, 2023, based largely on Mr. Fruge's representations, Ms. Williams signed up for Defendants' Amazon Store program.

22. On February 1, 2023, Ms. Williams paid $45,000 to buy the program or service Mr. Fruge sold during the webinar.

**B.  The Agreement and Mr. Fruge's Various Corporate Entities**

23. The written contract at issue (the "**Agreement**") [Doc. 5-1, provisionally sealed] states that the contract is between two parties, Ms. Williams and **Champion Ecom, LLP**, but there are discrepancies. A copy of the Agreement is attached to the Defendants previously filed motion to file the

agreement under seal [Doc. 6]. *See Provisionally Sealed Notice of Filing Exhibit to Motion to Dismiss* [Doc. 5-1].

24.    The first discrepancy is that it appears that neither party actually signed the Agreement.

25.    Ms. Williams, however, initialed the bottom of all the pages and signed a separately titled "Testimonial Addendum," subtitled as an Affidavit and Release.

26.    This addendum immediately follows the main Agreement but contains separately numbered paragraphs and appears to contain its own signature line.

27.    The addendum or the Agreement contains only a single signature line for Ms. Williams, which she signed via e-signature on January 31, 2023.

28.    In any case, neither the Agreement nor the addendum has any signature line for the company, and it does not appear that the company ever executed it.

29.    The other party—the company—stated in the Agreement is **Champion Ecom, LLP**, which appears to be **Champion E-Com, LLP**, a Texas limited liability partnership.

30.    The next day, when Ms. Williams paid $45,000 to sign up for Mr. Fruge's program, the receipt shows that the payment was made to **Champion E-Com, LLC**, (**not LLP**) on February 1, 2023.

7

31.    On April 14, 2023, **Champion E-Com, LLP**, was converted to **Champion E-Com, LLC**—a Texas limited liability company that also appears to be out of business—after Ms. Williams had already signed up.

### C. Mr. Fruge's Promises vs. Reality

32.    Despite Mr. Fruge's statements, assurances, and promises in enticing Ms. Williams to pay $45,000, her Amazon store never generated a single dollar in sales from the service Mr. Fruge sold, while it was managed by any of Fruge's companies.

33.    In retrospect, this is unsurprising because almost none of the services Fruge promised and listed in the Agreement were ever performed.

34.    The services promised in the Agreement involved a 2-year service agreement for managing Ms. Williams's new Amazon store.

35.    This included the initial setup of the Amazon store, product research to identify currently profitable products, development/buildout of the Amazon store, listing products, uploading inventory, processing orders, providing customer service, handling returns, addressing chargebacks, implementing customer review services, and analyzing store metrics to assist with store health and growth.

36.    Specifically, at Fruge's January 11, 2023 sales webinar, one PowerPoint slide listed the following promised services under the title referencing the Service Agreement.

37.    On the webinar, Fruge highlighted all of the following promised services—line by line—to participants, including Ms. Williams:

8

**We Do Automation For You – (Service Agreement)**

1. Top Research Team Works for You (What's Trending?)

2. We manage Inventory and list It all on your Amazon Store

3. We handle all packing, shipping and fulfillment

4. Amazon delivers your products to customers

5. We handle all returns and customer service

6. You collect 100% of the profit until initial purchase price Is recouped

*After 100% of your initial purchase is recouped, store split goes to 60/40*

(Source: July 11, 2023, Webinar Slide)

38.     Similarly, the written Agreement between Ms. Williams and Champion Ecom, LLP guaranteed a two-year period of full-service management for the Amazon store, along with a 60/40 profit split after Ms. Williams's $45,000 investment was fully recouped.

39.     In fact, aside from registering Ms. Williams's new Georgia LLC and opening an Amazon Store account, none of the relevant services related to operating the store were performed.

40.     In reality, Fruge and his various corporate entities were unable to carry out nearly all the tasks Fruge had promised.

41.     Fruge and his entities thus failed to fulfill any of the services Fruge had promised.

42.     No products were ever listed for sale.

43.     No inventory was ever uploaded.

9

44.     Failing ever to list products or upload inventory, Ms. Williams's store did not make a single sale from Fruge's promised services.

45.     As discussed below, Fruge later admitted to Ms. Williams by phone that things were the same or worse for all 500 of his customers at that time and that, although other businesses might meet Amazon's requirements, Fruge and his companies could not. Fruge acknowledged it would have taken another five years to develop the capabilities he had already claimed to possess.

46.     Having sold these never-delivered services to about 500 customers, as the alleged fraud was becoming apparent, Fruge devised a plan to avoid liability from the hundreds of customers realizing he had misrepresented the services he sold.

### D. Mr. Fruge's "Assignment" to Avoid Liability

47.     On June 2, 2023, Ms. Williams received an email from Fruge's employee, Dallas Middleton, stating that Ms. Williams's Amazon store—and all others—was suddenly being "transferred" to a new company called Digital Guidance.

48.     By making this "assignment," Fruge attempted to avoid liability before the true nature and extent of his scam was revealed.

49.     As Fruge later explained by phone, he simply "assigned" all responsibilities and obligations under the Agreement to a corporate entity that had not solicited the fraudulent sales or received Ms. Williams's $45,000.

50.    Moreover, by inducing Ms. Williams to pay $45,000 up front, Mr. Fruge had claimed she would pay no management fees until her entire $45,000 purchase price was recouped.

51.    Likewise, the written Agreement between Ms. Williams and Champion Ecom, LLP guaranteed a two-year full-service management period, followed by a 60/40 profit split only after Ms. Williams's initial $45,000 investment was fully recouped.

52.    Mr. Fruge's companies would operate her store, and once Ms. Williams had received her entire $45,000 back would, they would begin splitting profits 60/40.

53.    But after Fruge assigned all the stores to Digital Guidance, that contract was simply disregarded, and Digital Guidance informed Ms. Williams (and others) that they would have to begin paying management fees immediately.

54.    Fruge confirmed this in a call with Ms. Williams, spinning it as a positive. Fruge tried to convince Ms. Williams that discarding her right to recoup her own money first was beneficial, essentially claiming that because Fruge's companies were too incapable of making her store profitable, Digital Guidance's demands for immediate service fees were somehow an improvement.

55.    After assigning the stores to Digital Guidance, Fruge denied all liability for his obligations under the Agreement, disclaiming responsibility to Ms. Williams for the service he sold her.

11

56.     Despite that assignment, one year later Ms. Williams's store had yet to generate a single sale.

57.     In short, Fruge solicited money based on promises he either never intended or never was able to fulfill. He then tried to shield himself from liability by assigning the obligations to an unrelated third party, which promptly repudiated essential contract terms.

### E.  Mr. Fruge's Companies "Lose" All Ms. Williams's Inventory

58.     Having already paid $45,000 on February 1, 2023, Ms. Williams, on May 3, 2023, purchased inventory for $3,267.69 on her American Express card; on May 24, 2023, another $279.75; and on June 1, 2023, another $46.89—totaling $3,594.33.

59.     Nonetheless, her purported inventory never showed up in the store. After Ms. Williams spent months asking about her store and inventory, Fruge spoke to her by phone on or around September 13, 2023.

60.     During that call, Fruge stated that all of Ms. Williams's alleged inventory had been "lost."

### F.  Mr. Fruge's Ruse to "Release" Ms. Williams's Inventory Refund

61.     Fruge told Ms. Williams he would reimburse her for the lost inventory, but this was another ploy to trick Ms. Williams into signing a purported general release.

62.     By then, Fruge knew his service offering was built on false claims and unfulfillable promises and that he had already "assigned" all the stores.

12

63. Fruge told Ms. Williams she had to e-sign a document (the "Release Form") to get her refund. He explained it as a mere acknowledgment of the $3,600 refund amount so he could "release" her payment.

64. Ms. Williams e-signed the Release Form solely because Fruge said it was the only way he would process her $3,600 refund.

65. She signed on September 13, 2023, and the wire for around $3,600 arrived the next day, September 14, 2023.

66. This happened before Ms. Williams realized Fruge's entire Amazon store scheme was fraudulent from the start.

67. In September 2023, Ms. Williams had no reason to suspect Fruge's entire enterprise was based on false statements and unfulfillable promises.

68. Mr. Fruge's only concern was avoiding personal liability once his scheme was exposed, and he believed he had already assigned his obligations to Ms. Williams (and hundreds of others) to a third party.

## G.  Digital Guidance Is No Better

69. After Fruge's alleged "assignment" of all store agreements, Ms. Williams had no choice but to work with Digital Guidance.

70. On September 21, Ms. Williams paid Digital Guidance $5,000 for "brand approval," a classification normally provided at no charge by Amazon, allegedly letting the store sell brand-name products like Nike, Adidas, etc.

71. The agreement claimed Ms. Williams would get brand approval within 90 days.

72.    Digital Guidance never actually provided those services, and after repeated unreturned inquiries, Ms. Williams disputed the $5,000 charge. Digital Guidance then informed her it would no longer manage the store and cut off contact.

73.    Fruge, Champion, and the putative "transferee" (Digital Guidance and/or DOHA, LLC) have all ceased operations or had their corporate registrations revoked, failing to fulfill their promises.

## H.  Mr. Fruge's Admissions to Ms. Williams in January 2024

74.    Almost a year after Ms. Williams paid $45,000 based on Fruge's sales pitch, she again sought a refund, as almost nothing had been delivered.

75.    On or about January 2, 2024, Fruge phoned Ms. Williams in Georgia, identifying himself as CEO of Champion E-Com, admitting the problems since the beginning and describing their inability to do what he had promised on the webinar.

76.    Contradicting his original assurances, Fruge stated, "Even if we never sell a single product, ever, on your behalf, technically, our contract obligation is actually done."

77.    Fruge further acknowledged that Defendants had never been able to deliver what he claimed. In January 2024, Fruge said, "[Amazon] FBA takes years and years and years and years and years to establish as a foundational business. And it would've took [sic] us about five years [from mid-2023 when we 'assigned away all the stores']."

14

78.    Fruge also said, "Champion was phenomenal at onboarding and explanations and communication [i.e., sales], but we didn't have the infrastructure to be able to fulfill what Amazon needed on the FBA guidelines."

79.    Fruge admitted further, "Once we got into FBA and realized just how detailed Amazon wanted it, it would have took [sic] about 5 years to get to where the clients were actually making money." He also stated that they knew customers expected thousands per month in passive income, "but we just didn't have the infrastructure to do what Amazon needed."

80.    Put plainly, Fruge's offer was too good to be true, and his claim that they could do it in exchange for $45,000 was based on statements he knew or should have known were false, both during the January 2023 webinar and when he took roughly $3,600 from Ms. Williams for "inventory" in May and June 2023.

81.    In May and June 2023, Fruge had been busy assigning away all the contracts to absolve himself from liability for not fulfilling Ms. Williams's Agreement or those of hundreds of other customers.

82.    On the phone in January 2024, Fruge also admitted that assigning to Digital Guidance did not solve anything; while acknowledging the miserable transition, he asserted, "Technically, I have zero jurisdiction over anything, you know when it comes to Digital Guidance and their contract, because those contracts are no longer our contracts."

83.    About Digital Guidance, Fruge admitted further problems. For instance, "We already know that right now, literally all 900 stores email to that one email. Well, that's obviously not sustainable. Like there's no way in hell you can track that many emails."

84.    Ms. Williams described her frustrations, telling Fruge:

"I understand that. However, I initially signed up a year ago, actually, it was in January. And since then, I have just experienced a lot of horrible things. Like my inventory was lost. I have not seen one penny from just the Amazon store alone. I've tried to get a hold of Jonathon and Brian with the products. They don't ever really respond. It's really hard to get in touch with them.

"I ended up investing another $5,000 with brand approval, which they told me would take no longer than a week, and now it's been over 90 days. And it's just like, you know, the $45,000 that I initially put in, and yes, I understand that you guys got the LLC and got the store up and running. However, I could have done that myself for just a couple hundred dollars.[1]

"On top of that, I would just constantly get emails about operational costs, and you know, paying that, but nothing has ever operated in my store. Like I said yesterday, yes, it is open live, but there are no products, inventory got lost, and just like I said from the webinar, I just feel like, you know, you guys put up the expectations, like how much I should get within month 3, month 4, month five, you know, and I just want to know, like is anyone else like experiencing issues, or is it just my store, or what's going on?

85.    Mr. Fruge replied, "No, it's basically 500 of you. … Everything that you just said is what every single person is experiencing."

_____

[1] In reality, it only costs $100 to register a Georgia LLC, and Amazon Stores are free to create.

16

86.    Soon thereafter, Defendants stopped communicating entirely, leaving Ms. Williams with significant financial losses.

## I.  The FINRA Enforcement Action

87.    Before and during the events of this lawsuit, Fruge served as a licensed securities broker. After Ms. Williams's September phone call with Fruge and before their January 2, 2024 call, the Financial Industry Regulatory Authority (FINRA) published a November 2023 Letter of Acceptance, Waiver, and Consent ("Consent Letter"), No. 2022074939302, by which Fruge agreed to a two-year suspension and $10,000 fine concerning the very business that is the subject of this lawsuit.

The FINRA enforcement matter stemmed from an anonymous complaint about Fruge's outside business activity—Champion E-Commerce—at issue here. Among other items, the Consent Letter referenced a violation of FINRA Rule 2010, which requires members and associated persons to maintain high standards of commercial honor and just and equitable principles of trade in their business.

## J.  Summary of Defendants Actions

88.    Mr. Fruge's actions included the following unlawful practices:

**(1) Deceptive Advertising and Misrepresentation**: Ms. Williams contends Mr. Fruge made misleading promises, including in his primary sales webinar, about a turnkey Amazon store that would yield large profits. These

17

statements concealed the company's inability to deliver such promises, before Mr. Fruge's subsequent assignment of all contracts to Digital Guidance, LLC.

89. **(2) Unfair Practices**: Mr. Fruge and his various entities failed to deliver promised services or manage the Amazon store as promised and paid for, causing substantial financial harm to Ms. Williams. Further, Mr. Fruge led Ms. Williams into unknowingly signing a release of claims under false pretenses.

90. **(3) Failure to Disclose Material Facts**: At the time of Mr. Fruge's sales presentation and Ms. Williams's purchase, Mr. Fruge failed to disclose that they lacked the resources or capability to fulfill the agreed-upon terms.

91. Moreover, Mr. Fruge sought to escape obligations under Ms. Williams's contract by "assigning" them to another entity without informing Ms. Williams of his plan—even while still taking money from her in May/June 2023 for "inventory," the same period Fruge was assigning away his obligations.

92. According to Mr. Fruge on the January 2, 2024 call, over 500 other customers of Defendants shared Ms. Williams's predicament; some fared even worse. For example, some had their stores delisted by Amazon, while others found themselves permanently barred from selling on Amazon.

93. Ms. Williams thus files suit against Mr. Fruge and Champion E-Com, LLC for fraud and related causes of action, including violations of Georgia's Fair Business Practices Act (FBPA) and the Georgia RICO Act.

18

Ms. Williams likewise seeks to pierce the corporate veil and hold Fruge personally liable, as the main owner of Champion E-Com, LLC, for the contractual and tortious misconduct of Champion.

## CAUSES OF ACTION

### Count I:  Deceit/Fraudulent Misrepresentation

*(As to Defendant Fruge)*

94.    Ms. Williams incorporates by reference and realleges paragraphs 1–93 above as if fully set forth herein.

95.    Mr. Fruge personally made material misrepresentations to Plaintiff on or about January 11, 2023, including (but not limited to) the effect:

    a. "You should earn around $5K/month your first month," "By the 6th month, your store should be doing around $50,000 in sales" and "After you invest, you don't have to do much of anything. We will take care of everything." "We get these kind of results because we are experts at operating Amazon Stores." "You could try to do this yourself, but it takes years to develop the expertise that we have. That's why our stores sell so much out of the gate and why your monthly sales will grow so fast."

    b. Fruge falsely represented Defendants' "capability to run the Amazon store from the start," including that the store would be producing sales by Month 1."

    c. These or substantially similar statements occurred in Mr. Fruge's January 11, 2023 webinar, which Ms. Williams attended from home in Fulton County, Georgia.

96. Beyond the false claims of quick or high sales, Mr. Fruge made specific representations about stocking and operating Ms. Williams's store.

97. At the time Mr. Fruge made these claims, Mr. Fruge knew or was reckless in failing to know they were false because:

    a. Few, if any, of his customers had achieved anywhere near those sales.

    b. Mr. Fruge later admitted to Ms. Williams that "there were 500 other customers in the same boat or worse."

    c. When Ms. Williams told Fruge by phone, "I have not seen one penny," "the store is live but no products," "nothing has operated in my store," and asked if she was unique or if others had experienced similar issues, Fruge replied, "No, it's basically 500 of you…. everything you just said is what every single person is experiencing."

98. Fruge intended Ms. Williams to rely on these statements—which he knew or should have known were false—so she would invest $45,000.

99. Indeed, Ms. Williams justifiably relied on Fruge's statements and paid $45,000 around February 1, 2023, and another $3,594.33 for "inventory" between April and May 2023.

100. As a direct and proximate result, Plaintiff has incurred damages of at least $45,000, plus consequential damages, in amounts to be proven at trial.

101. Because Fruge's conduct was willful, malicious, and exhibited an entire want of care and conscious indifference to consequences, Ms. Williams seeks punitive damages under O.C.G.A. § 51-12-5.1.

102. Fruge's actions, as alleged, were done to further his private interests, willfully, maliciously, and oppressively, with conscious or callous indifference and specific intent to harm. Ms. Williams therefore is entitled to uncapped punitive damages from Fruge, in an amount sufficient to punish and deter him from similar conduct.

### Count II:  Fraudulent Inducement

*(As to Defendant Fruge)*

103. Ms. Williams incorporates by reference and realleges paragraphs 1–93 and 95–98 as if fully set forth here.

104. Mr. Fruge knowingly made the alleged false statements of material fact (detailed in paragraphs 13–15, 33–40, 37, 39–45, 77–80, 85 and others) with the intent to induce Plaintiff into signing the Amazon store management agreement.

105. Mr. Fruge knowingly made the false statements of material fact (referenced in ¶¶ 13–15, 33–40, 37, 39–45, 77–80, 85, among others) intending Ms. Williams to sign the Amazon store management agreement.

106.   Ms. Williams relied on these false representations and suffered at least $45,000 in losses, plus additional consequential and incidental damages.

107.   Because Mr. Fruge's conduct was willful, malicious, and indicated a total disregard for the consequences, Ms. Williams seeks punitive damages under O.C.G.A. § 51-12-5.1.

108.   Mr. Fruge's wrongdoing served his private ends and was willful, malicious, and wanton. Given the conscious and callous indifference to harmful consequences and his specific intent to harm, Ms. Williams is entitled to punitive damages in an amount sufficient to punish and deter Fruge.

## Count III:  Violation of the Georgia Fair Business Practices Act (FBPA)

*(As to Defendant Fruge and Champion E-Com, LLC)*

109.   Ms. Williams incorporates by reference and realleges ¶¶ 1–93, 95–98, and 104 as if fully stated here.

110.   Defendants engaged in unfair or deceptive acts or practices involving consumer transactions, in violation of Georgia's Fair Business Practices Act, O.C.G.A. §§ 10-1-390 – 10-1-408.

111.   Defendants conducted a broad marketing campaign over Instagram and YouTube, targeting hundreds of Georgia residents, including Ms. Williams.

112.   Defendants' deceptive or unfair acts and practices harmed not only Ms. Williams but also at least 500 other customers, as Fruge admitted. See ¶¶ 77–80, 84–85.

113.   The violations included:

(1) Deceptive Advertising and Misrepresentation, since Ms. Williams alleges Defendants misled her about delivering a turnkey Amazon store yielding significant profits, while omitting that Defendants could not fulfill such promises; (2) Unfair Practices, by failing to deliver the promised services, thereby causing Ms. Williams and hundreds of others significant financial losses, and tricking Ms. Williams into signing a purported release of claims under false pretenses; and (3) Failing to Disclose Material Facts, namely that Defendants lacked the resources or capability to deliver on the agreed-upon terms.

114.   Furthermore, in January 2024, Fruge admitted that over 500 customers were likewise affected.

115.   Though not strictly required under O.C.G.A. § 10-1-399(b), Ms. Williams nonetheless sent written notice on December 2, 2024—and a written demand by overnight delivery—to Mr. Fruge over the alleged FBPA violations. Mr. Fruge and Champion E-Com, LLC refused to remedy the situation.

116.   As a proximate result of Defendants' FBPA violations, Ms. Williams suffered no less than $45,000 in losses.

117.   Ms. Williams is entitled to three times her actual damages, under O.C.G.A. § 10-1-399(c), because Defendants' violations were intentional.

118.   Ms. Williams also may recover attorney's fees and litigation costs under O.C.G.A. § 10-1-399(d).

**Count IV:  Georgia RICO Act (O.C.G.A. §§ 16-14-1 – 16-14-13)**

*(As to Defendant Fruge and Champion E-Com, LLC)*

119.   Ms. Williams incorporates by reference and realleges ¶¶ 1–93, 95–98, and 104 as if fully stated here.

120.   This is a civil RICO action under O.C.G.A. §§ 16-14-1 – 16-14-13. At all relevant times, Mr. Fruge and his entities, including Champion E-Com, LLC, formed an association or enterprise aimed at fraudulently obtaining money from Ms. Williams and hundreds of other consumers via false pretenses.

121.   Defendants, alone and collectively, participated in a "pattern of racketeering activity" under O.C.G.A. § 16-14-3(4). Specifically:

**Wire Fraud (18 U.S.C. § 1343)**: Defendants caused interstate wires—emails, payment portals, online ads, electronic funds transfers—to induce Ms. Williams and others to invest in "done-for-you" Amazon stores, concealing Defendants' inability or unwillingness to provide the profits or services touted.

**Theft by Taking/Deception/Conversion (O.C.G.A. §§ 16-8-2, 16-8-3, 16-8-4)**: Defendants unlawfully converted Ms. Williams's $45,000 and additional inventory payments for their own use, depriving her of those funds under false pretenses.

122.   Fruge cultivated a false impression that Ms. Williams's funds would be used to run a profitable Amazon store, but instead Defendants

24

diverted her money for their own purposes, failed to perform the services, and assigned away contractual obligations to hide their scheme.

123. These acts spanned an extended period, had multiple victims, and formed a continuous course of conduct.

124. The racketeering acts shared the same or similar aims, methods, participants, victims, and results, including but not limited to:

      a. Targeting individuals via online marketing with wildly exaggerated ROI claims,

      b. Taking large up-front fees for "long-term" e-commerce services,

      c. Assigning or offloading contractual duties to underfunded third parties to avoid liability,

      d. Making unsuspecting customers sign "Release Forms" under false pretenses, prolonging the scheme.

125. Defendants' behavior constitutes an "enterprise" under O.C.G.A. § 16-14-3(3). Each Defendant directly or indirectly participated in this ongoing racketeering pattern.

126. Defendants defrauded hundreds of consumers—each paying large upfront fees—only to learn that Defendants would not perform. Their continuous and repeated conduct over a significant period exemplifies a "pattern of racketeering."

127. As a direct and proximate result of this racketeering, Ms. Williams lost $45,000 plus additional consequential damages.

128.   Under O.C.G.A. § 16-14-6(c), Ms. Williams is entitled to treble damages, punitive damages, attorney's fees, costs of investigation, and all just relief.

## Count V:  Breach of Contract

*(As to Defendant Fruge (via veil piercing) and Champion E-Com, LLC)*

129.   Ms. Williams incorporates by reference and realleges ¶¶ 1–93, 95–98, and 104 as if fully stated here.

130.   Around January 31, 2023, Ms. Williams and Fruge's companies entered a valid contract in which Defendants promised to provide Amazon store management and profit-sharing services in exchange for Ms. Williams's $45,000 payment.

131.   Defendants materially breached that contract by failing to render the agreed services.

132.   Additionally, Defendants breached by transferring their obligations to Digital Guidance and then denying all further contract duties.

133.   Because of these breaches, Ms. Williams lost $45,000 plus incidental and consequential damages proven at trial.

134.   On information and belief, regarding Champion E-Com, LLC, Fruge transferred corporate funds to personal accounts, paid personal expenses from the corporate checking account, and disregarded corporate formalities. Fruge operated the company as his alter ego.

135. On information and belief, Champion E-Com, LLC was deliberately or grossly undercapitalized from inception, unable to meet foreseeable business liabilities.

136. On information and belief, Champion E-Com, LLC was never adequately capitalized, rendering Ms. Williams's recourse futile without piercing.

137. On information and belief, Fruge intentionally kept Champion E-Com, LLC undercapitalized as a mere shell to evade personal liability, never maintaining adequate funds, lines of credit, or insurance to handle normal liabilities.

138. On information and belief, Fruge's consistent underfunding was part of an overall fraudulent scheme, ensuring the company could not pay any refunds, damages, or judgments for wrongdoing alleged herein.

## Count VI:  Claim for Punitive Damages

*(As to Defendant Fruge and Champion E-Com, LLC)*

139. Ms. Williams incorporates by reference and realleges ¶¶ 1–93, 95–98, and 104.

140. Defendants' alleged actions involve willful misconduct, malice, fraud, wantonness, oppression, and/or an entire want of care implying conscious indifference to consequences.

141. Ms. Williams thus qualifies for punitive damages to punish and deter Defendants.

142. Upon information and belief, Defendants acted with a specific intent to harm. Under O.C.G.A. § 51-12-5.1(f), Ms. Williams seeks uncapped punitive damages.

### Count VII:  Attorney's Fees and Costs of Litigation

*(As to Defendant Fruge and Champion E-Com, LLC)*

143. Ms. Williams incorporates by reference and realleges ¶¶ 1–93, 95–98, and 104 as if fully stated here.

144. By engaging in the misconduct described, Defendants acted in bad faith, were stubbornly litigious, and put Ms. Williams through unnecessary trouble and expense, entitling her to recover litigation costs, including reasonable attorney's fees, under O.C.G.A. § 13-6-11.

### REQUEST FOR RELIEF

WHEREFORE, Ms. Williams respectfully requests the following relief:

1. Judgment in favor of Plaintiff against Defendants for actual, consequential, nominal, uncapped punitive damages, and any other enhanced damages authorized by law or statute arising out of Defendants' misconduct, statutory violations, torts, and breaches;

2. Judgment in favor of Ms. Williams under the Georgia FBPA and O.C.G.A. §§ 10-1-399 *et seq.,* including treble damages;

3. Judgment in favor of Ms. Williams under the Georgia Civil RICO Act, O.C.G.A. §§ 16-14-1 *et seq.,* including treble damages

4.   Judgment in favor of Ms. Williams for punitive and uncapped damages under §§ 51-12-5.1 (b) and (f).

5.   Pre and post-judgment interest, together with attorney's fees and litigation expenses under O.C.G.A. §§ 13-6-11 and 10-1-399 (d).

6.   The taxing of all costs against Defendants;

7.   That Ms. Williams have a trial by jury; and

8.   Such other and further relief as the Court deems just and proper.


Respectfully submitted this 11th day of April, 2025.

**FALLON LAW PC**

*/s/ Brad Fallon*
Brad Fallon
Georgia Bar No. 226335
1201 W. Peachtree St. NW, Suite 2625
Atlanta, Georgia 30309
(404) 849-2199 | Fax (470) 994-0579
brad@fallonbusinesslaw.com

*Attorney for Plaintiff Williams*

29

## LOCAL RULE 7.1(D) CERTIFICATION

This document has been prepared in 13-point Century Schoolbook font, listed in LR 5.1(C), NDGa.

/s/ Brad Fallon
Brad Fallon
Georgia Bar No. 262335

## CERTIFICATE OF SERVICE

I certify that on this date, I filed a true and correct copy of the corrected *Plaintiff's First Amended Complaint* via the CM/ECF system, which will automatically notify all counsel of record:

Alex J. Bartko
ALEX BARTKO LAW, LLC
3715 Northside PKWY NW, Building 100-Ste 500
Atlanta, GA 30327
(470) 890-3285
ab@alexbartkolaw.com

*Counsel for Defendant Jake Fruge, Jr.*

Dated: April 11, 2025.

/s/ Brad Fallon
Brad Fallon
Georgia Bar No. 262335
*Attorney for Plaintiff*